## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

| | |
|---|---|
| In re<br><br>MONTREAL MAINE & ATLANTIC RAILWAY, LTD.<br><br>Debtor. | Chapter 11<br>Case No. 13-10670 |

### AFFIDAVIT OF M. DONALD GARDNER, JR. IN SUPPORT OF FIRST DAY PLEADINGS

I, M. DONALD GARDNER, JR., declare and state as follows:

1. My name is M. Donald Gardner, Jr. and I am the Vice President of Finance and Administration and Chief Financial Officer ("**CFO**") of Montreal, Maine & Atlantic Railway Ltd. ("**MMA**" or "**Debtor**"), a corporation organized and existing under the laws of Delaware. I am familiar with the MMA's day-to-day operations, businesses, financial affairs and restructuring and sale efforts.

2. On August 7, 2013 (the "**Petition Date**"), MMA filed with this Court a voluntary petition (the "**Petition**") for relief under chapter 11 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"). To enable the Debtor to operate effectively and preserve the value of estate assets for eventual sale, the Debtor has requested various types of relief in "first day" applications and motions filed with this Court contemporaneously herewith (collectively, the "**First Day Pleadings**").[1] The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[1] "First Day Pleadings" refer to:

    1. Debtor's Motion for Order Authorizing the Use of Cash Collateral (the "**Cash Collateral Motion**");

Affidavit in Support of First Day Pleadings (D. Gardner).doc

3. I am authorized by MMA to submit this Affidavit on its behalf in support of the MMA's bankruptcy petition and the First Day Pleadings. Except as otherwise indicated, all of the facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, information supplied to me by other members of the MMA's management team or professionals retained by MMA, or my opinion based upon my experience and knowledge of the MMA's business and financial condition. The First Day Pleadings seek, among other things, to: (a) operate the Debtor while preserving the value of its assets for sale; (b) obtain authorization to use cash collateral; (c) maintain employee morale and confidence by honoring certain wage obligations; (d) preserve customer and vendor relationships by continuing to operate in an orderly fashion during the course of the bankruptcy filing; (e) ensure the continuation of the Debtor's cash management systems and other business operations with minimal interruption; and (f) establish certain other administrative procedures to promote a smooth transition into chapter 11 and coordination between this Court and the court in Canada overseeing a related proceeding.

4. Gaining and maintaining the support of the Debtor's employees, customers, vendors and other key constituencies, including tort plaintiffs, insurers, and state, federal and provincial governments in the United States and Canada, as well as maintaining the day-to-day

---

2. Debtor's Motion for Authorization to Use Pre-Petition Bank Accounts and Business Forms (the "**Bank Account Motion**");

3. Debtor's Motion to Pay Employee Prepetition Wages, Salary, Contributions, Payroll Taxes and other Expenses (the "**Wage Motion**"); and

4. Debtor's Motion to (i) Prohibit Utilities from Altering, Refusing or Discontinuing Services, and (ii) Establish Procedures for Determining Requests for Additional Adequate Assurance (the "**Utilities Motion**");

Any capitalized term not expressly defined herein shall have the meaning given to that term in the relevant First Day Pleading.

operations of the Debtor's business with minimal disruption, will be critical to the Debtor's operations in chapter 11 as it prepares itself for an eventual sale.

5.  If called upon to testify, I could and would testify competently to the facts set out in this Affidavit. Parts I-III of this Affidavit describes the Debtor's business and circumstances surrounding the filing of the chapter 11 petitions. Part IV sets forth the relevant facts in support of the First Day Pleadings.

### I. Description of MMA's Background

6.  MMA operates in an integrated, international shortline freight railroad system (the "**MMA System**" or "**System**") with its wholly-owned Canadian subsidiary, Montreal Maine & Atlantic Canada Co. ("**MMA Canada**"). The System has 510 route miles of track in Maine, Vermont and Quebec and operates from its head office in Hermon, Maine. MMA, a Delaware corporation, was formed to acquire the assets of the Bangor & Aroostook Railroad Company and affiliated railways (collectively, for purposes of this affidavit, "**BAR**") from the Trustee of the BAR bankruptcy estate in 2003. The asset purchase agreement was approved by the United States Bankruptcy Court for the District of Maine on October 8, 2002, and, on January 9, 2003, MMA and the Trustee closed the purchase. MMA has operated the System since its purchase from BAR. Until recently, the MMA System employed approximately 179 people and operated about 15 trains daily with a fleet of 26 locomotives.

7.  The MMA System is a substantial component of the transportation system of Northern Maine, Northern New England, Quebec and New Brunswick. Main-line operations in the MMA System are conducted regularly between Millinocket and Searsport, Maine, and from Brownville Junction, Maine to Montreal, Quebec. Service is also provided between Farnham,

Quebec and Newport, Vermont to connect with the northeastern U.S. westbound trains to Montreal. As a whole, the System provides:

    (a)    the shortest rail transportation route between Maine and Montreal and a critical rail artery between Saint John, New Brunswick and Montreal;

    (b)    strategic links to the Canadian Pacific Railroad, the Canadian National Railroad, and Guilford Rail System and beyond to the North American rail system;

    (c)    outlets for major producers of paper, lumber, wood and agricultural products in eastern and northern Maine; and

    (d)    in-bound transportation for chemicals and other products used by paper producers and consumers in Maine.

8.    MMA and MMA Canada, while separate companies, have fully integrated business operations and accounting, with MMA collecting most of the revenue generated by the System and then transferring to MMA Canada the funds it requires to pay its expenses.[2]

    *A.*    *The Debtor's Debt Structure*

9.    As of the Petition Date, the Company's indebtedness is briefly summarized below.

**Secured Indebtedness**

    *(a)*    ***The Federal Rail Administration***

10.    MMA is indebted to the United States of America, represented by the Secretary of Transportation acting through the Administrator of the Federal Rail Administration ("**FRA**"), under a $34,000,000 Loan and Security Agreement dated March 24, 2005, as such agreement may have been amended, modified, renewed or extended from time to time (the "**FRA Credit**

---

[2] For tax purposes, income and common expenses (*e.g.*, costs related to MMA's head office, where the management personnel shared by both companies is located) are allocated 60% to MMA and 40% to MMA Canada.

Agreement" or "**FRA Credit Facility**"). The outstanding balance under the FRA Credit Facility is approximately $27.5 million.

11. To secure the obligations under the FRA Credit Agreement, the FRA holds a first priority lien against substantially all of MMA's U.S. and Canadian real estate.

### (b) *Wheeling & Lake Erie Railway Company*

12. MMA also has a $6 million dollar line of credit with Wheeling & Lake Erie Railway Company ("**Wheeling**") pursuant to a certain Line of Credit and Security Agreement dated as of June 15, 2009, as such agreement may have been amended, modified, renewed or extended from time to time (the "**Wheeling LOC**"), which, as of the Petition Date, was fully drawn. To secure the Wheeling LOC, Wheeling asserts an interest in the Debtor's accounts receivable and inventory, along with the proceeds thereof. Wheeling has filed a UCC-1 Financing Statement in Delaware to perfect its security interest.

### (c) *Unsecured Indebtedness*

13. MMA has estimated that, excluding unliquidated, contingent, or disputed claims, it is indebted in the amount of approximately $3.5 million dollars for ordinary course trade payables.

## II. Events Leading to the Bankruptcy Filings

14. On July 6, 2013, at approximately 1:15 AM EST, an unmanned eastbound MMA train with 72 carloads of crude oil and 5 locomotive units derailed at the Rue Frontenac road crossing in Lac-Mégantic, Quebec, a town of approximately 6,000 located approximately 10 miles from Maine's western border (the "**Derailment**"). The transportation of the crude oil had begun in New Town, North Dakota, by Canadian Pacific Railway ("**CP**") and MMA Canada later accepted the rail cars from CP at Saint-Jean, Québec. The crude oil was to be transported

*via* the Saint-Jean-Lac-Mégantic line through Maine to its ultimate destination in Saint John, New Brunswick. The Derailment set off several massive blasts, destroyed part of the downtown core, and is presumed to have killed 47 people. A large quantity of oil was released into the environment, necessitating an extensive cleanup effort. As a result of the Derailment, as of the Petition Date, lawsuits were filed in Chicago and Quebec against MMA and others, and more claims are expected.

15. Clean-up and recovery efforts have been ongoing since the Derailment but significant damage, including the closing or interruption of businesses and environmental damage, is still being assessed.

16. Prior to the Derailment, MMA had benefitted from the dramatically increased use of trains to move oil from the middle of the country to the refineries on the coasts. U.S. and Canadian oil drillers were producing oil faster than new pipelines could be built, and trains were needed to transport crude oil to refineries. Until the accident, MMA had been hauling about a half million barrels a month through Quebec and Maine, bound for the Irving Oil refinery in Saint John, New Brunswick. This business played an important part in MMA System's aggregate monthly gross revenues of approximately $3 million dollars.

17. As a result of the Derailment, however, the company has lost much of its freight business because Canadian authorities are not currently allowing trains to travel between Maine and Quebec on the MMA Canada line. Post-Derailment, MMA's aggregate gross revenues swiftly declined to approximately $1 million dollars per month. MMA is hopeful that Canadian authorities will permit through service to be restored shortly. Given the dramatically reduced cash flow and increase in liabilities, a bankruptcy filing is the only option to preserve the value of the System.

### III. The Bankruptcy Filing

18. MMA, in conjunction with a concurrent proceeding (the "**Canadian Proceeding**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") for MMA Canada, intends preserve the MMA System as a going concern, and propose a plan for the resolution of claims. It is possible, perhaps likely, that this will involve a sale of the System as a going concern. MMA contemplates using the proceeds from all assets, including insurance policies, to fund one or more trusts for the benefit of claimants. MMA further contemplates working with representatives of the various categories of claimants to develop an efficient process for liquidating claims and distributing funds. This process would likely provide for contributions to be made by certain parties in exchange for full and final releases of all claims and liabilities.

### IV. Facts in Support of First Day Pleadings

*A. General Support*

19. Concurrently with filing of its Chapter 11 case, MMA filed the First Day Pleadings and requested emergency or expedited hearings on the same (the "**First Day Hearing**") at which the Court will hear and consider certain of the First Day Pleadings. I have reviewed each of the First Day Pleadings, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleading is tailored to meet the goals described above and is necessary if the Debtor is to operate in chapter 11 until a sale of the System can be consummated.

20. I also believe that it is critical that some of the First Day Pleadings be heard as soon as possible. For instance, if the relief sought in the Cash Collateral Motion is not granted on an emergency basis, the Debtor, among other things, will not have access to cash collateral

critical to the Debtor's ability to preserve going concern value and maximize the value of the estate. The impact of such a scenario would be immediate, and cause irreparable harm to the Debtor and all its constituencies. Accordingly, the emergency approval of the Cash Collateral Motion is (a) critical to preservation of the Debtor's going concern value; and (b) in the best interests of the estate, its creditors, and the public.

21. It is my belief that, with respect to those First Day Pleadings that request the authority to pay discrete prepetition claims, the relief requested is essential to the Debtor's efforts to protect the value of its assets and to avoid immediate and irreparable harm to the Debtor.

*B.   Cash Collateral Motion*

22. As noted above, MMA has a $34 million dollar secured credit facility with the Federal Rail Administration (the "FRA"), which obligation is purportedly secured by a first priority mortgage on substantially all of MMA's real estate in the United States and Canada. MMA does not believe FRA has an interest in Cash Collateral (as that term is defined in the Bankruptcy Code).

23. Also as noted above, MMA also has a $6 million dollar line of credit with Wheeling under the Wheeling LOC. Wheeling asserts a security interest in MMA's inventory, accounts receivable, and the proceeds thereof (collectively, the "**Cash Collateral**").

24. MMA proposes to give Wheeling a replacement lien on all Cash Collateral generated post-petition. MMA's projections for the next three weeks attached to the motion to use cash collateral show that Wheeling will be adequately protected for the MMA's use of Wheeling's cash collateral.

25.  Without the use of Cash Collateral, the Debtor would be unable to operate and unable to preserve the significant going concern value of its operations. MMA's remaining customers need to be assured that the Debtor will continue to operate. Additionally, the Bankruptcy Code itself recognizes the vital service rail provides in this country and embodies a policy of continuing the operation of the System.[3] Continuing to operate will allow the Debtor to generate new receivables in which Wheeling will receive a replacement lien, thereby preserving the value of Wheeling's collateral.

26.  The use of Cash Collateral will allow MMA (and MMA Canada) to operate in an orderly fashion in order to preserve going concern value, serve its customer, and maximize the assets available to creditors

C.  *Bank Account Motion*

27.  As discussed above, MMA and MMA Canada operate in the U.S. and Canada as one system on an integrated basis. As such, MMA maintains bank accounts in both the United States and Canada. In the United States, MMA maintains accounts at TD Bank (operations), Bank of America (car hire income)[4] and Bangor Savings Bank (*de minimis*; operations). In Canada, MMA maintains two accounts at the Canadian Imperial Bank of Commerce ("CIBC"), one for deposits of U.S. funds and one for deposits of Canadian funds which consists primarily of the Canadian ISS deposits (collectively, the "**Bank Accounts**").

---

[3] Chapter 11 is the only vehicle for reorganization or liquidation of a railroad, which, pursuant to 11 U.S.C. § 109(b)(1) cannot avail itself of Chapter 7 relief.

[4] Car hire income represents car hire and repair revenue, net of car hire and repair expense. Car hire and repair revenue is income earned by the Debtor and its affiliates from other railroads for use of the Debtor's freight cars on the lines of other railroads and for the Debtor's repair of freight cars owned by others while the cars on the Debtor's lines. Car hire and repair expense represent expenses incurred by the Debtor for use of others' freight cars on the Debtor's lines and for repairs made to the Debtor's cars by other railroads.

28.     While acknowledging the United States Trustee's requirements can serve a useful function in certain chapter 11 cases, allowing the Bank Accounts to be maintained with the same account numbers will assist the Debtor in accomplishing a smooth transition to operations in chapter 11 and will avoid a massive disruption to the organization's existing cash management system that would be attendant to any new accounts. Any change would be particularly disruptive since MMA is a beneficiary under the Railroad Clearinghouse, Inc. (the "**Clearinghouse**" or "**RCH**"), a trust established by the Association of American Railroads ("**AAR**") to facilitate settlement and payment of interline freight charges among its members.[5] If the Debtor is required to open new accounts, it may disrupt deposits under the Interline Settlement System to TD Bank (in the U.S.) and CIBC (in Canada). The ISS deposits represent the major source of operating revenue for the Debtor each month and any disruption in the settlements would have severe and swift operational consequences for the Debtor.

29.     Finally, as the Bank Accounts are the only accounts from which checks are written, and the Debtor has not closed and re-opened any bank accounts immediately pre-petition, the Debtor believes the only issued and outstanding checks as of the Petition Date will be covered by an order of this Court authorizing that those pre-petition checks to be honored. Accordingly, there is little risk that claims arising prior to the Petition Date and not covered by

---

[5] Because shipping freight any distance by rail generally requires the services of several railroad lines, shippers routinely pay one carrier (the "**Collecting Carrier**") a charge for the entire journey. That amount includes the charges of each railroad along the way. Thus, with regard to inter-line shipments, each railroad may be at once the Collecting Carrier for some, receiving funds and accruing obligations to participating carriers; and for others a participating carrier, accruing rights to freight charges for shipments which travel over its rails. In order to sort out who owes what to whom, many railroads, including MMA, have entered into a comprehensive arrangement to "net out" their entitlements and obligations on a monthly basis. Railroads doing business under the Clearinghouse structure agree to deal with one another through rules promulgated by AAR. Those rules include the Railway Accounting Rules and the ISS ("**Interline Settlement System**") Railroad Clearinghouse Settlement Regulations.

an order of the Court will be inadvertently satisfied by the negotiation of checks written prior to the Petition Date.

30. By motion, the Debtor is also requesting that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices) and checks existing immediately before the Petition Date without reference to the Debtor's status as a debtor-in-possession. Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor-in-possession as a result of press coverage for this high-profile case. Moreover, if the Debtor is required to change its correspondence, business forms and checks, it would be forced to choose standard forms rather than the current forms with which the Debtor's employees and customers are familiar. Such a change in operations would create a sense of disruption and potential confusion.

31. For these reasons, the Debtor seeks authorization to use existing checks and business forms provided that it affixes a stamp designating its status as "Debtor-in-Possession."

D. *Wage Motion*

32. In the Wage Motion, the Debtor seeks authority of this Court to authorize it to pay certain pre-petition employee obligations, including pre-prepetition employee benefits and amounts advanced by employees on Debtor's behalf and to continue to honor programs under which employee obligations arise in the ordinary course of the Debtor's business.

33. In conducting its operations, the Debtor currently employs approximately 54 people. This is a dramatic decrease from the number of people it employed prior to the Derailment and, without these remaining employees, the Debtor would be unable to operate, causing swift and significant impairment of the going-concern value of the Debtor's enterprise. With respect to these employees, as described in more detail in the Wage Motion, the Debtor

incurs payroll and various other obligations. By virtue of the Wage Motion, the Debtor seeks authority to pay such pre-petition amounts as they come due.

34. This relief is particularly important since many of the Debtor's employees live week-to-week, relying on their paychecks to pay everyday living expenses. If the Debtor fails to pay pre-petition wage obligations timely, this will create a financial hardship for, and result in low morale among the Debtor's remaining employees, all of whom are already operating in an extremely stressful environment. For all these reasons, the Debtor seeks authority to pay the accrued but unpaid wage obligations due as of the Petition Date.

35. In the Wage Motion, the Debtor also seeks authority to pay amounts it is required by law to withhold from employee wages to the relevant taxing authorities and to authorize payments from its own funds on account of federal, state, and local withholding taxes to allow the Debtor to comply with its obligations under federal and state law.

36. The Debtor believes that authorizing all of the payments described in the Wage Motion is critical to the Debtor's operations while in bankruptcy. The benefits achieved by paying employees far outweigh the adverse consequences of not paying them.

37. Given the bankruptcy filing, the Debtor cannot risk damage to its business from a decline in employees' morale. Absent the relief requested in the Wage Motion, employees may suffer undue hardship and, in many instances, severe financial difficulties. For all of these reasons, the Debtor believes that granting it the authority to pay the employee wages and benefits outlined in the Wage Motion is in the best interest of the Debtor and its bankruptcy estate.

E. *Utilities Motion*

38. In the ordinary course of its businesses, the Debtor uses electric, telephone, sewer, water, cable, and oil utility services provided by the utility companies listed on Exhibit A

attached to the Utilities Motion, (the "**Utility Companies**").[6] The Debtor's post-petition operating budget attached to its Cash Collateral Motion demonstrates cash flow sufficient to keep payments current to all Utility Companies, but it cannot risk a Utility Company discontinuing service.

39. The services listed on Exhibit A to the Utilities Motion are essential to the Debtor's ongoing business operations. A termination of utility services would create unsafe conditions and cause a cessation of rail operations.

40. Accordingly, the Debtor believes that the relief requested in the Utilities Motion is in the best interest of the estate and the Debtor should be authorized to provide the deposits in the amounts provided therein.

F. *Emergency or Expedited Hearings on the First Day Pleadings*

41. Given the importance of the relief sought in the First Day Pleadings to the Debtor's ability to preserve value as it seeks to reorganize under the protection of the Bankruptcy Code, the Debtor will move for entry of an order scheduling emergency or expedited hearings on the First Day Pleadings, as appropriate.

**[Remainder of Page Intentionally Left Blank]**

---

[6] The Debtor does, however, reserve the right to challenge at a later time whether any of the companies in the Exhibit A to the Utilities Motion are, in fact, utility companies.

Dated: August 6, 2013

_____
M. Donald Gardner, Jr.

STATE OF **MAINE**
**PENOBSCOT**            , ss.                                            August 6, 2013

Personally appeared the above-named M. DONALD GARDNER, JR. and made oath that the above-stated facts are true based on his own knowledge, information and belief and, to the extent that they are based upon information and belief, he swears that he believes them to be true.

Before me,

_____
Notary Public

GAYNOR L. RYAN
Notary Public, Maine
My Commission Expires May 4, 2015